UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH CHICARIELLI,

                        Plaintiff,

            -v-

UNITED STATES OF AMERICA et al.,

                        Defendants.

14 Civ. 6765 (JGK)

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY THE UNITED STATES OF AMERICA, THE AGENCY DEFENDANTS, AND THE INDIVIDUAL FEDERAL DEFENDANTS

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2677
Fax: (212) 637-2702
Email: samuel.dolinger@usdoj.gov

SAMUEL DOLINGER
Assistant United States Attorney
– Of Counsel –

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................4

    A.    Allegations of the Second Amended Complaint ...................................4

    B.    Procedural History ...........................................................................5

ARGUMENT ..........................................................................................................6

I.     THE FTCA CLAIM AGAINST THE UNITED STATES FOR FAILURE TO PROTECT SHOULD BE DISMISSED ...........................................................7

II.    THE COURT SHOULD GRANT THE AGENCY DEFENDANTS' MOTION TO DISMISS ...................................................................................................12

    A.    The FTCA Claims Against the Agency Defendants Should Be Dismissed ..........12

    B.    The *Bivens* Claims Against the Agency Defendants Should Be Dismissed .........13

III.   THE COURT SHOULD GRANT THE PROTECTION DEFENDANTS' MOTION TO DISMISS ......................................................................................13

    A.    The Official-Capacity Claims Are Barred by Sovereign Immunity ....................14

    B.    The SAC Fails to Plead a *Bivens* Claims Against the Protection Defendants for Deliberate Indifference to a Serious Risk of Harm to Plaintiff ....................14

    C.    The SAC Fails to Plead Personal Involvement by Any of the Protection Defendants ....................18

        1.    The *Bivens* Claim Against Defendant Fermin Should Be Dismissed .......19

        2.    The *Bivens* Claim Against Defendant Murray Should Be Dismissed ....................20

        3.    The *Bivens* Claims Against Defendants Strada and Linaweaver Should Be Dismissed ....................21

        4.    The *Bivens* Claims Against Defendants Madison, Monge, Ward, and Hughes Should Be Dismissed ....................23

      5.      The *Bivens* Claim Against Defendant Thiessen Should Be Dismissed .................................................................................................24

      6.      The *Bivens* Claim Against Defendant Santiago Should Be Dismissed .................................................................................................24

      7.      The *Bivens* Claim Against Defendants Toossi and Tiscione Should Be Dismissed .........................................................................................27

IV.     THE COURT SHOULD GRANT THE MEDICAL DEFENDANTS' MOTION TO DISMISS.............................................................................................27

    A.     The Official-Capacity Claims Are Barred by Sovereign Immunity .....................27

    B.     The *Bivens* Claims Against the Medical Defendants Fail as a Matter of Law.........................................................................................................28

      1.      Plaintiff's Claims Relating to the Diagnosis and Treatment of His Jaw Condition Should Be Dismissed .......................................................34

      2.      Plaintiff's Claims Relating to the Provision of Medication and a Liquid Diet Are Baseless and Should Be Dismissed ...............................44

V.      THE *BIVENS* CLAIMS ARE ALSO BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY ................................................................................46

VI.    PLAINTIFF'S "CONDITIONS OF CONFINEMENT" CLAIM SHOULD BE DISMISSED....................................................................................................48

CONCLUSION....................................................................................................................49

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE**

*Abdur-Raheem v. Caffery*,
   No. 13 Civ. 6315 (JPO), 2015 WL 667528 (S.D.N.Y. Feb. 17, 2015) ...........................48

*Aguilar v. Immigration & Customs Enf't Div.*,
   811 F. Supp. 2d 803 (S.D.N.Y. 2011) ................................................................ 6, 24, 29

*Arar v. Ashcroft*,
   585 F.3d 559 (2d Cir. 2009) .......................................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................*passim*

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
   968 F.2d 196 (2d Cir. 1992)..........................................................................................6

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001).................................................... 19, 20, 24, 44

*Barone v. United States*,
   No. 12 Civ. 4103 (LAK), 2014 WL 4467780 (S.D.N.Y. Sept. 10, 2014)....................9, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................................6, 19

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
   403 U.S. 388 (1971) ..........................................................................................*passim*

*Blake v. Kelly*,
   No. 12 Civ. 7245 (ER), 2014 WL 4230889 (S.D.N.Y. Aug. 26, 2014) ..................... 14, 15

*Buffaloe v. Fein*,
   No. 12 Civ. 9469 (AJP), 2013 WL 5815371 (S.D.N.Y. Oct. 24, 2013)..........................36

*C.P. Chem. Co. v. United States*,
   810 F.2d 34 (2d Cir. 1987)..........................................................................................12

*Calderon v. United States*,
   123 F.3d 947 (7th Cir. 1997).................................................................................9, 11

*Cantor Fitzgerald Inc. v. Lutnick*,
   313 F.3d 704 (2d Cir. 2002)..........................................................................................6

*Castro v. United States*,
   34 F.3d 106 (2d Cir. 1994)..........................................................................................48

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)........................................................................................29

*Chance v. Armstrong*,
   143 F.3d 698 (2d Cir. 1998)........................................................................ 15, 35, 38

*Cohen v. United States*,
   151 F.3d 1338 (11th Cir. 1998)..................................................................................10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991)..........................................................................................30

*Cuoco v. Moritsugu*,
   222 F.3d 99 (2d Cir. 2000)..........................................................................................15

*Davis v. Cnty. of Nassau*,
    355 F. Supp. 2d 668 (E.D.N.Y. 2005)........................................................23
*DeMeo v. Koenigsmann*,
    No. 11 Civ. 7099 (HBP), 2015 WL 1283660 (S.D.N.Y. Mar. 20, 2015)........................35
*Desulma v. City of New York*,
    No. 98 Civ. 2078 (RMB) (RLE), 2001 WL 798002 (S.D.N.Y. July 6, 2001)...............17
*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)..................................................................25
*Donaldson v. United States*,
    281 F. App'x 75 (3d Cir. 2008)...............................................................10
*Doninger v. Niehoff*,
    642 F.3d 334 (2d Cir. 2011)..................................................................47
*Dotson v. Griesa*,
    398 F.3d 156 (2d Cir. 2005)..................................................................14
*Dowdy v. Hercules*,
    No. 07 Civ. 2488 (ENV) (LB), 2010 WL 169624 (E.D.N.Y. Jan. 15, 2010)...............20
*El-Hanafi v. United States*,
    No. 13 Civ. 2072 (GHW), 2015 WL 72804 (S.D.N.Y. Jan. 6, 2015).................35, 36
*Ellis v. Blum*,
    643 F.2d 68 (2d Cir. 1981)...................................................................22
*Enigwe v. Zenk*,
    No. 03 Civ. 854 (CBA), 2007 WL 2713849 (E.D.N.Y. Sept. 14, 2007).................8, 9
*Estelle v. Gamble*,
    429 U.S. 97 (1976)........................................................................31, 36
*Farmer v. Brennan*,
    511 U.S. 825 (1994) ...................................................................*passim*
*Fazi v. United States*,
    935 F.2d 535 (2d Cir. 1991)...................................................................7
*FDIC v. Meyer*,
    510 U.S. 471 (1994) .........................................................................12
*Fernandez v. N.Y.C. Dep't of Corr.*,
    No. 08 Civ. 4294 (KMW), 2010 WL 1222017 (S.D.N.Y. Mar. 29, 2010) .................17
*Garcia v. Watts*,
    No. 08 Civ. 7778 (JSR), 2009 WL 2777085 (S.D.N.Y. Sept. 1, 2009) ....................20
*Gill v. Mooney*,
    824 F.2d 192 (2d Cir. 1987)..................................................................19
*Gilles v. Repicky*,
    511 F.3d 239 (2d Cir. 2007)..................................................................47
*Gilmore v. Rivera*,
    No. 13 Civ. 6955 (RWS), 2014 WL 1998227 (S.D.N.Y. May 14, 2014) ...................15
*Hamm v. United States*,
    483 F.3d 135 (2d Cir. 2007)..................................................................12
*Harris v. Fischer*,
    No. 11 Civ. 6260 (CM) (JLC), 2014 WL 3859242 (S.D.N.Y. Aug. 1, 2014)...............46
*Harrison v. Barkley*,
    219 F.3d 132 (2d Cir. 2000)..................................................................36

*Hathaway v. Coughlin*,
    37 F.3d 63 (2d Cir. 1994) ...................................................................... 15, 41
*Hathaway v. Coughlin*,
    99 F.3d 550 (2d Cir. 1996)...................................................................35, 39, 42
*Haughton v. Clinton*,
    No. 15 Civ. 1160 (JPO), 2015 WL 9244398 (S.D.N.Y. Dec. 17, 2015) ........................ 18
*Hayes v. N.Y.C. Dep't of Corr.*,
    84 F.3d 614 (2d Cir. 1996)..................................................................................... 16
*Hendrickson v. U.S. Atty. Gen.*,
    No. 91 Civ. 8135, 1994 WL 23069 (S.D.N.Y. Jan. 24, 1994)....................................... 20
*Hernandez v. Keane*,
    341 F.3d 137 (2d Cir. 2003)................................................................................... 37
*Hightower v. United States*,
    205 F. Supp. 2d 146 (S.D.N.Y. 2002) ...................................................................... 13
*Hunter v. Bryant*,
    502 U.S. 224 (1991) ............................................................................................. 47
*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) ...................................................................................... 29
*Jones v. Lewis*,
    874 F.2d 1125 (6th Cir. 1989)................................................................................ 35
*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011).................................................................................... 30
*Lanman v. Hinson*,
    529 F.3d 673 (6th Cir. 2008).................................................................................. 19
*Macaluso v. Nassau Cnty. Corr. Ctr.*,
    No. 13 Civ. 6206 (SJF) (WDW), 2014 WL 1401429 (E.D.N.Y. Apr. 8, 2014).............. 17
*Madera v. Ezekwe*,
    No. 10 Civ. 4459 (RJD) (LB), 2013 WL 6231799 (E.D.N.Y. Dec. 2, 2013)............. 35, 39
*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)..................................................................................... 6
*Malsh v. Austin*,
    901 F. Supp. 757 (S.D.N.Y. 1995) ......................................................................... 34
*Martinez v. Simonetti*,
    202 F.3d 625 (2d Cir. 2000).................................................................................... 47
*Millares Guiraldes de Tineo v. United States*,
    137 F.3d 715 (2d Cir. 1998).................................................................................... 7
*Mitchell v. Forsyth*,
    472 U.S. 511 (1985) ............................................................................................. 47
*Mitchell v. United States*,
    225 F.3d 361 (3d Cir. 2000)................................................................................... 10
*Morgan v. City of New York*,
    No. 12 Civ. 282 (ALC) (RLE), 2014 WL 3952917
    (S.D.N.Y. Aug. 12, 2014) ..................................................................... 16, 18, 22, 27
*Olmedo v. Corizon P.C.*,
    No. 14 Civ. 3853 (AT) (HBP), 2015 WL 4002306 (S.D.N.Y. June 22, 2015) ............... 35

*Ortiz v. United States*,
    No. 01 Civ. 4665 (AKH), 2002 WL 1492115 (S.D.N.Y. July 11, 2002)................. 10, 11
*Palacio v. Ocasio*,
    No. 02 Civ. 6726 (PAC) (JCF), 2006 WL 2372250 (S.D.N.Y. Aug. 11, 2006)........ 31, 34
*Palmer v. Richards*,
    364 F.3d (2d Cir. 2004) .....................................................................................48
*Parris v. N.Y.S. Dep't of Corr. Servs.*,
    947 F. Supp. 2d 354 (S.D.N.Y. 2013) ...........................................................17
*Paulino-Duarte v. United States*,
    No. 02 Civ. 9499 (RCC), 2003 WL 22533401 (S.D.N.Y. Nov. 7, 2003) ......................13
*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................................................47
*Perez v. Hawk*,
    302 F. Supp. 2d 9 (E.D.N.Y. 2004)................................................................22
*Rhodes v. Chapman*,
    452 U.S. 337 (1981) ..........................................................................................9
*Richardson v. Goord*,
    347 F.3d 431 (2d Cir. 2003)..........................................................................24
*Robinson v. Lindsay*,
    No. 09 Civ. 2852 (RJD), 2009 WL 3007920 (E.D.N.Y. Sept. 21, 2009)......................23
*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994).............................................. 6, 13, 14, 28
*Salahuddin v. Goord*,
    467 F.3d 263 (2d Cir. 2006)..........................................................................35
*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ..........................................................................................6
*Scrima v. Hasty*,
    No. 97 Civ. 8433 (JGK), 1998 WL 661478 (S.D.N.Y. Sept. 24, 1998).......................8, 9
*Sereika v. Patel*,
    411 F. Supp. 2d 397 (S.D.N.Y. 2006) ...........................................................12
*Shannon v. U.S. Parole Comm'n*,
    No. 97 Civ. 6420 (JGK), 1998 WL 557584 (S.D.N.Y. Sept. 2, 1998)............................22
*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998)............................................................................6
*Southerland v. N.Y.C. Hous. Auth.*,
    No. 10 Civ. 5243 (SLT), 2010 WL 4916935 (E.D.N.Y. Nov. 23, 2010) .......................23
*Tavarez v. Reno*,
    54 F.3d 109 (2d Cir. 1995).............................................................................14
*Tineo v. United States*,
    137 F.3d 715 (2d Cir. 1998)............................................................................7
*Trammell v. Keane*,
    338 F.3d 155 (2d Cir. 2003)..........................................................................49
*Turkmen v. Hasty*,
    789 F.3d 218 (2d Cir. 2015)........................................................ 19, 22, 43
*United States v. Dalm*,
    494 U.S. 596 (1990) ..........................................................................................7

*United States v. Gaubert*,
    499 U.S. 315 (1991) ...................................................................................8
*United States v. Mitchell*,
    445 U.S. 535 (1980) ...................................................................................7
*United States v. S.A. Empresa de Vicao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984) ...................................................................................8
*Victor v. Milicevic*,
    361 F. App'x 212 (2d Cir. 2010) ..............................................................31
*Wilson v. Layne*,
    526 U.S. 603 (1999) .................................................................................47
*Winters v. United States*,
    No. 10 Civ. 7571 (JMF), 2013 WL 1627950, (S.D.N.Y. Apr. 16, 2013).................*passim*
*Word v. Croce*,
    169 F. Supp. 2d 219 (S.D.N.Y. 2001) ......................................................46
*Yearney v. Sidorowicz*,
    No. 13 Civ. 3604 (CM), 2014 WL 2616801 (S.D.N.Y. June 10, 2014)...........................43
*Young v. United States*,
    No. 12 Civ. 2342 (ARR) (SG), 2014 WL 1153911 (E.D.N.Y. Mar. 20, 2014).......... 7, 8, 9
*Zimmerman v. Macomber*,
    No. 95 Civ. 882 (DAB), 2001 WL 946383 (S.D.N.Y. Aug. 21, 2001)...........................17

## STATUTES

18 U.S.C. § 4042.................................................................................... 8, 9, 10
28 U.S.C. § 1346.............................................................................................12
28 U.S.C. §§ 2671-2680..................................................................................12
28 U.S.C. § 2679.............................................................................................12
28 U.S.C. § 2680...............................................................................................7
42 U.S.C. § 1983.............................................................................................14

## RULES

Fed. R. Civ. P. 12.....................................................................................*passim*
Fed. R. Civ. P. 56.....................................................................................25, 30

## PRELIMINARY STATEMENT

Plaintiff Joseph Chicarielli ("Plaintiff") asserts causes of action under the Federal Tort Claims Act ("FTCA") and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiff has brought suit against the United States of America ("United States"), several U.S. agencies, and a multitude of individual federal employees as *Bivens* defendants.  Plaintiff asserts two claims under the FTCA, one for the alleged failure to protect him against an assault while Plaintiff was incarcerated at the Metropolitan Correctional Center ("MCC"), and a second for the United States' alleged failure to provide him with reasonable medical treatment in the aftermath of the assault.  Plaintiff's *Bivens* claims are also divided into two groups: first, federal correctional and law enforcement personnel who, Plaintiff claims, failed to protect him from the assault; and second, medical personnel alleged to have been deliberately indifferent to Plaintiff's medical condition.  Last, Plaintiff asserts a claim labeled "Conditions of Confinement."

Plaintiff's claims fail for a variety of reasons.  First, the Court should dismiss in part the FTCA claims against the United States.  The FTCA claim alleging that the United States and its agents failed to protect Plaintiff is barred under the FTCA's discretionary function exception because Plaintiff attempts to second-guess the Bureau of Prisons' discretionary decision concerning whether he should have been placed in the general population at the MCC.

Second, Plaintiff's claims fail as a matter of law against Defendants U.S. Department of Justice, Federal Bureau of Prisons, Metropolitan Detention Center, and Metropolitan Correctional Center (collectively, the "Agency Defendants").  The FTCA's limited waiver of sovereign immunity only permits suit against the United States of America.  Moreover, a *Bivens* cause of action may be brought only against individual defendants in their personal capacities.

Accordingly, the Agency Defendants are not subject to claims under either the FTCA or *Bivens*, and all claims against the Agency Defendants should be dismissed.

Third, the Court should dismiss the *Bivens* claims against the individual defendants who are alleged to have failed to protect Plaintiff—Frank Strada, Catherine Linaweaver,[1] Lenora Murray, Steve Tiscione, Amir Toossi, Kori Thiessen, Casanova Madison, Miguel Monge, Michael Ward,[2] Geis Fermin, Angelo Santiago, and Shirlean Hughes[3] (the "Protection Defendants"). Plaintiff's pleadings contain only conclusory allegations of the Protection Defendants' knowledge of alleged threats against Plaintiff. Similarly bare are the allegations of personal involvement by any of the Protection Defendants in any purported failure to protect Plaintiff. Indeed, as to some of the Protection Defendants, Plaintiff fails to make any such allegations at all. Plaintiff's Second Amended Complaint ("SAC") simply does not state a claim that any of the Protection Defendants were aware of and ignored a serious risk to his safety.

Fourth, the Court should dismiss the *Bivens* claims against the individual federal defendants who are alleged to have been deliberately indifferent to Plaintiff's medical needs— Erwin Ramos, Robert Beaudouin, Chito Evangelista, Ophelia Jackson, and Anthony Bussanich[4] (the "Medical Defendants"). Plaintiff's complaint asserts that his requests for medical attention to his jaw after the alleged attack on June 25, 2013—including a request for an x-ray—were

---

[1] Strada and Linaweaver are identified in the SAC as "Warden MDC" and "Warden MCC."

[2] Incorrectly identified in the caption as "Michael Warden."

[3] Hughes's name does not appear in the caption, but references to Hughes appear in two paragraphs of the Second Amended Complaint. (*See* Dkt. No. 27 ("SAC") ¶¶ 12, 22.)

[4] This Office does not represent Dr. Tin Chin, a contract psychiatrist (and not a BOP employee) at the time of the events alleged.

ignored by the Medical Defendants. However, medical records that are integral to the complaint belie this claim. According to those medical records, Plaintiff received medical care immediately after the attack on June 25, and was x-rayed within days. An outside radiologist concluded that the x-ray was negative. Plaintiff continued to receive medical attention in the weeks that followed, and when he told prison staff that he continued to experience pain several weeks later, he was x-rayed again. This time, a different outside radiologist concluded that Plaintiff's jaw was fractured. Shortly thereafter, Plaintiff was operated upon by an outside maxillofacial surgeon and, to ensure proper healing, his jaw was wired shut and Plaintiff was given a liquid diet for the two-week period until the surgeon removed the wires and reported that Plaintiff's jaw had healed. There is simply no basis for a claim that the Medical Defendants were deliberately indifferent to Plaintiff's medical needs.

Fifth, the doctrine of qualified immunity provides an independent ground for dismissal of the *Bivens* claims. Because the SAC does not plausibly plead that any of the Protection Defendants or the Medical Defendants were personally involved in the violation of a clearly established constitutional right, they are immune from the *Bivens* claims.

Sixth, Plaintiff's "conditions of confinement" claim, relating to his housing assignment, should be dismissed. The SAC is unclear both as to the legal basis and the intended defendants for this claim. Because it appears that Plaintiff is attempting to bring a constitutional claim, it cannot be brought against the United States under the FTCA. Furthermore, if this claim is intended to be a *Bivens* claim, it is subject to dismissal because (1) it does not plausibly allege that any individual defendants were personally involved in the alleged conduct, and (2) it fails either as a due process claim or an Eighth Amendment claim.

**BACKGROUND**

**A.    Allegations of the Second Amended Complaint[5]**

According to the allegations of the SAC, Plaintiff was an inmate held in the custody of the Bureau of Prisons ("BOP") at the times relevant to the SAC.  (Dkt. No. 27 ("SAC") ¶ 6.)  In November 2012, Plaintiff was incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  (Id. ¶ 14.)  Plaintiff alleges that he was a "cooperating witness" who was assisting the Department of Justice ("DOJ") against "members of organized crime."  (Id. ¶ 15.)  In November 2012, Plaintiff asserts, his belongings were stolen and he was subjected to threats and an attack due to his cooperation with DOJ.  (Id. ¶¶ 16-17.)  After an alleged assault on November 18, 2012, Plaintiff claims that he was "put in solitary confinement at MDC," and that Plaintiff and his attorney informed Assistant United States Attorneys ("AUSAs") Amir Toossi and Steve Tiscione about the threats.  (Id. ¶¶ 17-19.)  Plaintiff then was transferred from MDC to MCC.  (See id. ¶¶ 21-23, 71.)

Plaintiff conclusorily asserts that certain BOP personnel at MCC and others allegedly involved in his transfer or supervision—Strada, Linaweaver, Thiessen, Santiago, Madison, Monge, Ward, Hughes, Murray, Tiscione, and Toossi—were aware of the alleged threats against him.  (Id. ¶¶ 12, 20-22.)  Plaintiff contends that the Protection Defendants "did not provide Plaintiff with any protection and instead released him into general population."  (Id. ¶ 23.)  According to the SAC, on June 25, 2013, Plaintiff was "viciously attacked by the members in his cell" and was injured.  (Id. ¶ 24.)

Plaintiff alleges that the second group of Bivens defendants—Ramos, Beaudouin, Evangelista, Jackson, and Bussanich, along with Defendant Chin—provided deficient medical

---

[5] The well-pleaded allegations of the SAC are accepted as true for purposes of this motion.

4

care after the attack by refusing to provide an x-ray and denying Plaintiff other medical treatment.  (*Id.* ¶¶ 25-33.)  Plaintiff further alleges that the Medical Defendants failed to diagnose Plaintiff with a broken jaw until six weeks after the incident.  (*Id.* ¶¶ 34-36.)  Finally, Plaintiff claims that the Medical Defendants refused to provide him with "any medication or liquid diet" and "failed to provide plaintiff with proper nutrition," causing him to lose 25 pounds.  (*Id.* ¶¶ 37-38.)

## B.   Procedural History

Plaintiff filed this suit on August 20, 2014, and originally named as defendants the United States, DOJ, BOP, MCC, MDC, and three unidentified "John Doe" individuals.  (Dkt. No. 1.)  On January 21, 2015, the Court authorized Plaintiff to file an amended complaint to name the same parties and add several additional "John Doe" defendants.  (Dkt. No. 9.)  On February 24, 2015, Plaintiff filed a First Amended Complaint.  (Dkt. No. 13.)  The United States and the Agency Defendants (DOJ, BOP, MCC, and MDC) answered the First Amended Complaint.  (Dkt. No. 20.)  Defendants then produced numerous documents to Plaintiff to permit the identification of the John Doe defendants.  (*See* Dkt. Nos. 21, 22, 24.)

Plaintiff filed the SAC on August 10, 2015, naming the United States, the Agency Defendants, and adding a number of individual defendants.  (Dkt. No. 27.)  Plaintiff asserts claims under the FTCA and *Bivens*, premised both upon (1) his allegations that certain Defendants failed to protect him against assault in prison, and (2) his allegations that his medical care was deficient.  (SAC ¶¶ 40-92.)  Plaintiff also asserts a cause of action labeled "Conditions of Confinement," which appears to be a claim that his housing assignment by BOP was unconstitutional.  (*Id.* ¶¶ 93-100.)

## ARGUMENT

A claim must be dismissed when a district court lacks the statutory or constitutional authority to adjudicate it. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). On a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff carries the burden of establishing that the Court has subject matter jurisdiction to adjudicate his complaint. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). A plaintiff must prove that subject matter jurisdiction exists by a preponderance of the evidence. *See Makarova*, 201 F.3d at 113. Meanwhile, though a court considering a Rule 12(b)(1) motion must "accept as true all material factual allegations in the complaint," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), for purposes of assessing jurisdiction, it will not draw "argumentative inferences favorable to the party asserting jurisdiction," *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992).

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept as true the well-pleaded factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). That said, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555); *see also Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) (stating that a court need not give "credence to [a] plaintiff's conclusory allegations"). "A court can thus begin its analysis of the sufficiency of pleadings by 'identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Aguilar v. Immigration & Customs Enf't Div.*, 811 F. Supp. 2d 803, 807 (S.D.N.Y. 2011) (quoting *Iqbal*, 556 U.S. at 679). If well-pleaded factual

allegations exist, the court must then determine whether they plausibly give rise to an entitlement for relief. *Iqbal*, 556 U.S. at 679.

## I.  THE FTCA CLAIM AGAINST THE UNITED STATES FOR FAILURE TO PROTECT SHOULD BE DISMISSED

Plaintiff's FTCA claims should be dismissed in part: the FTCA claim alleging that the United States and its agents failed to protect Plaintiff is barred under the FTCA's discretionary function exception ("DFE"), 28 U.S.C. § 2680(a), because Plaintiff attempts to second-guess BOP's discretionary decision concerning whether he should have been placed in the general population.

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (alterations and internal quotation marks omitted).  Congress can waive the Government's sovereign immunity only through unequivocal statutory language, and may impose conditions on such a waiver. *See United States v. Dalm*, 494 U.S. 596, 608 (1990).  Waivers of sovereign immunity and their conditions must be strictly construed. *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998).

The FTCA exempts from its waiver of sovereign immunity any claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  "A court lacks subject matter jurisdiction over any claim falling within the discretionary function exception." *Young v. United States*, No. 12 Civ. 2342 (ARR) (SG), 2014 WL 1153911, at *13 (E.D.N.Y. Mar. 20, 2014) (citing *Fazi v. United States*, 935 F.2d 535, 537 (2d Cir. 1991)); *accord Winters v. United States*, No. 10 Civ. 7571

(JMF), 2013 WL 1627950, at *4 (S.D.N.Y. Apr. 16, 2013) ("Where the DFE applies, it follows that a court lacks subject matter jurisdiction to hear the claim.").

The purpose of the DFE "is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotation marks omitted). "The Supreme Court has explained that the DFE 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Winters*, 2013 WL 1627950, at *4 (quoting *United States v. S.A. Empresa de Vicao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). "A claim falls within the discretionary function exception if it satisfies a two-part test: (1) the challenged government conduct must be discretionary, meaning it involves an 'element of judgment or choice' and is not mandated by statute or regulation; and (2) the judgment must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Young*, 2014 WL 1153911, at *13 (quoting *Gaubert*, 499 U.S. at 322-23). "If the governmental action is the product of judgment or choice, the discretionary function exception applies unless the plaintiff can show that the judgment is not of the kind that the exception was designed to shield." *Enigwe v. Zenk*, No. 03 Civ. 854 (CBA), 2007 WL 2713849, at *8 (E.D.N.Y. Sept. 14, 2007) (citing *Gaubert*, 499 U.S. at 323).

"18 U.S.C. § 4042(a), the federal statute that prescribes the duties of the BOP, provides in relevant part that the BOP must 'provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States . . . [and] provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.'" *Scrima v. Hasty*, No. 97 Civ. 8433 (JGK),

8

1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998) (quoting 18 U.S.C. § 4042(a)(2)-(3)).

However, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or

avoid while attempting to fulfill their duty to protect inmates." *Calderon v. United States*, 123

F.3d 947, 950 (7th Cir. 1997). "The absence of specific guidelines of appropriate conduct by

BOP officials in administering these duties, therefore, leaves judgment or choice to BOP

officials." *Scrima*, 1998 WL 661478, at *3.

At the first step, courts in this district have repeatedly held that federal prison officials'

decisions concerning whether an inmate should be held in the general population or the Special

Housing Unit ("SHU")—and decisions concerning inmate safety more broadly—are

discretionary decisions under the DFE. *See Barone v. United States*, No. 12 Civ. 4103 (LAK),

2014 WL 4467780, at *12 (S.D.N.Y. Sept. 10, 2014) ("In general, courts have deemed the

federal government immune with respect to claims challenging the decision of whether and when

to return an inmate from the SHU to the prison's general population."); *Young*, 2014 WL

1153911, at *13 ("[D]ecisions regarding inmate security and safety are discretionary in nature.");

*Winters*, 2013 WL 1627950, at *5 ("[I]t is well established that while the [BOP] has a statutory

duty to 'provide suitable quarters and provide for the safekeeping, care, and subsistence' of

inmates [under] 18 U.S.C. § 4042(a)(2), decisions about how to safeguard prisoners are

discretionary." (citing cases)); *Enigwe*, 2007 WL 2713849, at *8 ("[A]lthough prison officials

have a statutory duty to protect inmates from harm, in general decisions regarding the best way

to safeguard prisoners are discretionary in nature." (citing cases)); *see also Rhodes v. Chapman*,

452 U.S. 337, 349 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left

to the discretion of prison administrators."). "No federal statute, regulation, or policy require[s]

the BOP to take a particular course of action to ensure" inmate safety, and therefore, the "first

9

step of the [DFE] analysis is satisfied." *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (unpublished); *see also Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (holding that "even if [18 U.S.C.] § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception").

Second, prison officials' determinations regarding whether inmates should be held in protective custody are also "plainly 'susceptible to policy analysis.'" *Winters*, 2013 WL 1627950, at *5 (quoting *Donaldson*, 281 F. App'x at 77). "[D]ecisions as to which inmates should be separated and which inmates should be placed in administrative detention or more closely monitored involve a balancing of a number of public policy considerations including the inmate safety, the ability of inmates to move about the facility, general concerns for prison security, and the effective use of limited resources." *Ortiz v. United States*, No. 01 Civ. 4665 (AKH), 2002 WL 1492115, at *4 (S.D.N.Y. July 11, 2002); *see also Donaldson*, 281 F. App'x at 77 (the issue of "how best to protect one inmate from the threat of attack by another . . . 'is of the kind that the discretionary function exception was designed to shield'" (quoting *Mitchell v. United States*, 225 F.3d 361, 363 (3d Cir. 2000))). A decision to return an inmate to the general population from a segregated unit after a threat "requires consideration of many factors, including the safety of inmates and correctional facility workers, the security and good order of the correctional facility, and the wise use of institutional resources." *Winters*, 2013 WL 1627950, at *5 (internal quotation marks omitted).

Here, Plaintiff's allegations that the United States is responsible for an alleged failure to protect him hinge on discretionary decisions by prison officials that are shielded by the DFE. The SAC alleges that Plaintiff and his attorney informed Defendants Toossi and Tiscione about

10

threats against Plaintiffs, and conclusorily states that various BOP personnel were "made aware" of those threats.  (*See* SAC ¶¶ 19-22.)  The SAC further asserts that the prison officials "did not provide Plaintiff with any protection and instead released him into general population," rather than placing him in protective custody (*Id.* ¶ 23; *see also id.* ¶ 72.)  Further, Plaintiff alleges that prison officials had the "duty . . . to operate, maintain, and manage [MDC and MCC], protecting inmates against vicious and dangerous attacks," but "breached their duty to the plaintiff by failing to protect plaintiff . . . ."  (*Id.* ¶¶ 46-47.)

Plaintiff's claims, like those considered in the cases cited above, stem from discretionary decisions concerning inmate safety and inmate housing assignments that fall within the core of the DFE.  Prison officials' decision whether to place Plaintiff in the SHU or the general population on the basis of reported threats is precisely the sort of decision that has been held to be both discretionary and subject to policy analysis, and thus shielded by the DFE.  *See, e.g.*, *Winters*, 2013 WL 1627950, at *5; *Ortiz*, 2002 WL 1492115, at *3-4 (holding that "the decision by BOP officials not to put [the plaintiff] in protective custody or separate him" from an aggressor—despite the fact that Plaintiff reported that his cooperation with the government resulted in murder and other criminal charges against the aggressor—"fell within the discretionary function exception").  Therefore, Plaintiff's FTCA claim based on an alleged failure to protect Plaintiff from threats within prison should be dismissed.  *See Calderon*, 123 F.3d at 951 (holding, in a case where the plaintiff alleged that he reported threats from a specific inmate to prison officials and was subsequently attacked by the same inmate, that the DFE "serves to protect the BOP from suit, even if the BOP abused its discretion or was negligent in the performance of its discretionary functions").

## II.   THE COURT SHOULD GRANT THE AGENCY DEFENDANTS' MOTION TO DISMISS

Because the Agency Defendants are not proper defendants to either FTCA or *Bivens* claims, the Court should dismiss all claims in the SAC against them for lack of subject matter jurisdiction.

### A.   The FTCA Claims Against the Agency Defendants Should Be Dismissed

The Court should dismiss the FTCA claims against the Agency Defendants for lack of subject matter jurisdiction under Rule 12(b)(1).  Sovereign immunity protects both "the Federal Government and its agencies" from suit.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  The FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, effects "a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (internal quotation marks omitted). The waiver of sovereign immunity codified in 28 U.S.C. § 1346(b) gives the Court jurisdiction over "civil actions on claims against the United States," and the remedy against the United States is "exclusive," *id.* § 2679(a).  Thus, "[t]he FTCA expressly provides that only the United States may be held liable for torts committed by a federal agency, and not the agency itself."  *C.P. Chem. Co. v. United States*, 810 F.2d 34, 37 n.1 (2d Cir. 1987); *Meyer*, 510 U.S. at 476 ("[T]he federal agency cannot be sued in its own name . . . ." (internal quotation marks omitted)); *see also, e.g.*, *Sereika v. Patel*, 411 F. Supp. 2d 397, 409 (S.D.N.Y. 2006) (dismissing FTCA claims against BOP and MCC for lack of subject matter jurisdiction and holding that "[t]he FTCA precludes tort suit against federal agencies and makes the only proper federal institutional defendant in such an action the United States").  Accordingly, sovereign immunity shields the Agency Defendants from Plaintiff's claims, and these claims should be dismissed under Rule 12(b)(1).

**B.**     **The *Bivens* Claims Against the Agency Defendants Should Be Dismissed**

To the extent that Plaintiff asserts constitutional claims for monetary damages against the Agency Defendants, those claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). "It is well-established that the purpose of a *Bivens* claim is to hold individual federal defendants accountable for their personal conduct that violates a plaintiff's constitutional rights." *Barone*, 2014 WL 4467780, at *6 (citing *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (en banc)).  *Bivens* suits against U.S. agencies are considered suits against the United States, and such claims against the United States are barred by the doctrine of sovereign immunity.  *See Robinson*, 21 F.3d at 510; *Paulino-Duarte v. United States*, No. 02 Civ. 9499 (RCC), 2003 WL 22533401, at *3 (S.D.N.Y. Nov. 7, 2003) (dismissing *Bivens* claim against BOP and MCC for lack of subject matter jurisdiction); *Hightower v. United States*, 205 F. Supp. 2d 146, 155 (S.D.N.Y. 2002) ("[S]overeign immunity clearly precludes a *Bivens* action against . . . a federal agency or the United States").  Thus, to the extent Plaintiff is asserting a constitutional tort claim against the Agency Defendants, that claim should be dismissed for lack of subject matter jurisdiction.

### III.   THE COURT SHOULD GRANT THE PROTECTION DEFENDANTS' MOTION TO DISMISS

Plaintiff fails to state a *Bivens* claim against the Protection Defendants.  First, Plaintiff attempts to plead claims against the Protection Defendants in their official capacities, which are barred by the doctrine of sovereign immunity.  Second, Plaintiff's pleadings do not establish that any of the Protection Defendants were deliberately indifferent to a risk of serious harm to Plaintiff.  The SAC fails to allege that any of the Protection Defendants were aware of a *particularized risk* to Plaintiff's safety.  Third, Plaintiff's *Bivens* claims against the Protection Defendants are founded on conclusory assertions of individual knowledge and participation in a

13

purported failure to protect Plaintiff against the assault.  Accordingly, the Court should dismiss all claims in the SAC against the Protection Defendants for lack of subject matter jurisdiction or failure to state a claim.

## A.    The Official-Capacity Claims Are Barred by Sovereign Immunity

Plaintiff purports to assert *Bivens* claims against the Protection Defendants in their official capacities.  (*See* SAC ¶ 12 (asserting claims against the Protection Defendants "acting in their individual and official capacities").)  It is black-letter law that the official-capacity claims should  be dismissed.  "The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities."  *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005); *accord Robinson*, 21 F.3d at 510.  Accordingly, the Court should dismiss the official-capacity claims against the Protection Defendants.

## B.    The SAC Fails to Plead a *Bivens* Claims Against the Protection Defendants for Deliberate Indifference to a Serious Risk of Harm to Plaintiff

"The Eighth Amendment requires that prison officials take reasonable measure[s] to guarantee the safety of inmates in their custody."  *Blake v. Kelly*, No. 12 Civ. 7245 (ER), 2014 WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014) (internal quotation marks omitted).[6]  However, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Rather, a plaintiff states a *Bivens* deliberate indifference claim only where the complaint plausibly alleges two elements: (1) that the alleged deprivation

---

[6] It is common for federal courts to incorporate law from cases that address constitutional claims under 42 U.S.C. § 1983 when analyzing *Bivens* claims. *See, e.g.*, *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995) (per curiam).

is, objectively, "sufficiently serious"—that is, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that, subjectively, the defendant prison officials acted with a "sufficiently culpable state of mind," one of "deliberate indifference to inmate health or safety." *Id.*

On the objective prong, "[t]he Second Circuit has defined sufficiently serious as 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Gilmore v. Rivera*, No. 13 Civ. 6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  In the context of prison safety, a plaintiff may allege a substantial risk of serious harm by alleging facts demonstrating that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.*  "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." *Id.*

On the subjective prong, "a plaintiff must show something more than mere negligence." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  Rather, a prison official "acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837).  In other words, "in order for a plaintiff to allege a constitutional deprivation of his Eighth Amendment rights on the basis of a failure to protect, he must show that a prison official acted unreasonably when aware of a significant risk of serious injury." *Blake*, 2014 WL 4230889, at *5 (internal quotation marks omitted).

15

In the context of prison safety, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). In other words, the complaint must allege that "corrections officers knew of and disregarded a *particular risk* to [the inmate's] safety." *Morgan v. City of New York*, No. 12 Civ. 282 (ALC) (RLE), 2014 WL 3952917, at *3 (S.D.N.Y. Aug. 12, 2014) (emphasis added).

Plaintiff fails to allege that any of the Protection Defendants had the requisite subjective state of mind necessary to state a *Bivens* claim.[7] As noted above, Plaintiff fails to plausibly allege that he was threatened *at MCC*—the facility where he had been moved after reporting threats at MDC—by the unspecified "members of organized crime." And more importantly, Plaintiff makes no allegation that prison officials had any way to know about a threat from his assailant or assailants: that is, Plaintiff provides no basis to believe that prison officials *knew* about a *particularized* risk to his safety. There is no nonconclusory allegation that Plaintiff was threatened or previously attacked by his assailant—or, for that matter, by any inmate at MCC.

Plaintiff asserts, in conclusory fashion, that he was "attacked by individuals who were associated with the members" of organized crime. (SAC ¶ 73.) But even assuming *arguendo* that this conclusory allegation is true, Plaintiff fails even to allege that prison officials *knew* of a connection between his assailant and these unidentified "members of organized crime." The SAC falls far below the level required to plead that prison officials were deliberately indifferent to such a risk, as it provides no reason to believe that prison officials could have been aware of

---

[7] For purposes of this motion, the Protection Defendants assume *arguendo* that Plaintiff has pleaded an objective risk of harm.

16

the risk at all.  *See Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294 (KMW), 2010 WL

1222017, at *4 (S.D.N.Y. Mar. 29, 2010) ("Absent clear notice of a risk of harm to the prisoner,

'courts routinely deny deliberate indifference claims based upon surprise attacks.'" (quoting

*Zimmerman v. Macomber*, No. 95 Civ. 882 (DAB), 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21,

2001)) (alteration omitted)).

Where there is no allegation that prison officials were aware that a particular inmate

posed a risk of harm to the plaintiff, claims of deliberate indifference stemming from an inmate

attack fail.  *See Parris v. N.Y.S. Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013)

(dismissing deliberate indifference claim because "the plaintiff has alleged no facts suggesting

that any of the defendants knew of a *particular risk* to the plaintiff's safety," and stating that "the

fact that the plaintiff claims he is unaware of the identity of his attacker makes it implausible to

infer that the defendants had any particular knowledge of the risk the plaintiff faced" (emphasis

added)); *see also Macaluso v. Nassau Cnty. Corr. Ctr.*, No. 13 Civ. 6206 (SJF) (WDW), 2014

WL 1401429, at *6 (E.D.N.Y. Apr. 8, 2014) ("Plaintiff's allegation that he was attacked because

he cooperated with law enforcement officials against [the attacker] in no way demonstrates that

[the *Bivens* defendants] were aware of this fact or that [the attacker] posed a threat to plaintiff's

safety"); *Fernandez*, 2010 WL 1222017, at *4 (dismissing deliberate indifference claim where

"Plaintiff has not pled, for example, that he and [the alleged attacker] were involved in a prior

altercation, that [the attacker] had previously threatened him, or that there was any other reason

for officers . . . to be on notice that there was a risk of altercation between Plaintiff and [the

attacker]"); *Zimmerman*, 2001 WL 946383, at *6 (rejecting deliberate indifference claim where

there was "no evidence of any prior problem between Plaintiff and his attacker of which any

Defendants were or should have been aware"); *Desulma v. City of New York*, No. 98 Civ. 2078

(RMB) (RLE), 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) ("[G]iven the lack of a prior

history of violence between [the plaintiff] and [his assailants], and the nature of the inmates'

verbal threats against [the plaintiff], [a defendant officer] had no reason to infer the existence of

a threat of harm, much less a life-threatening danger."). In fact, "[c]ourts have denied deliberate

indifference claims even where the officer is aware of a specific conflict between the plaintiff

and the attackers." *Haughton v. Clinton*, No. 15 Civ. 1160 (JPO), 2015 WL 9244398, at *2

(S.D.N.Y. Dec. 17, 2015) (citing cases).

Plaintiff alleges that he was threatened and attacked, and his cell "ransacked," by

unidentified "members of organized crime" when he was incarcerated at MDC. (SAC ¶¶ 16-18,

69-70.) Even by Plaintiff's own account, however, this resulted in Plaintiff's transfer from MDC

to MCC. (*See id.* ¶ 71.) The SAC contains no plausible allegation that Plaintiff was assaulted or

threatened at MCC before the incident in question. Plaintiff does not allege that he was engaged

in any previous altercation with his attacker or any other inmate at MCC, or that he requested

that officials separate him from his attacker. Accordingly, the SAC contains no factual support

for its contention that any of the Protection Defendants could have known that Plaintiff's safety

was at risk at MCC.

Because the SAC fails to set out the elements of the deliberate indifference test, the

*Bivens* claims against all of the Protection Defendants should be dismissed. *See Morgan*, 2014

WL 3952917, at *3 ("Because Plaintiff has alleged no facts that any of the Defendants knew of a

particular risk to Plaintiff's safety, Plaintiff has failed to state a claim that Defendants were

deliberately indifferent in preventing a surprise attack.").

**C.     The SAC Fails to Plead Personal Involvement by Any of the Protection Defendants**

The claims against each of the Protection Defendants should be also dismissed for the

independent reason that the SAC fails to plead that any them had sufficient personal involvement

in the alleged failure to protect Plaintiff.  "Because vicarious liability is inapplicable to *Bivens*

and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see Gill*

*v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (noting that personal involvement in a

constitutional deprivation is a prerequisite to recovery).  "[E]ach Government official, his or her

title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.  The

"proper inquiry" is whether the complaint pleads each defendant's liability under the "elements

of the underlying constitutional tort." *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015).

Most of the SAC's allegations against the Protection Defendants are made in pleadings

against the entire group and provide no specificity as to the alleged acts of the individual

Defendants.  Such group pleadings are insufficient, as they do not put the Protection Defendants

on notice of what it is alleged that they did or did not do.  *See Twombly*, 550 U.S. at 555 (stating

that Rule 8 requires that the complaint "give the defendant fair notice of what the claim is and

the grounds upon which it rests" (internal quotation marks and ellipsis omitted)); *Atuahene v.*

*City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (holding that complaint

failed to satisfy Rule 8 by "lumping all the defendants together in each claim and providing no

factual basis to distinguish their conduct"); *see also Lanman v. Hinson*, 529 F.3d 673, 684 (6th

Cir. 2008) ("This Court has consistently held that damage claims against government officials

arising from alleged violations of constitutional rights must allege, with particularity, facts that

demonstrate what each defendant did to violate the asserted constitutional right.").

### 1.     The *Bivens* Claim Against Defendant Fermin Should Be Dismissed

The caption of the SAC refers to "G. Fermin," but that is the only reference to Fermin in

the entirety of the SAC.  Fermin is not even mentioned in the SAC's group pleadings against the

Protection Defendants generally.  There is no allegation that Fermin was personally involved in

any deprivation of Plaintiff's constitutional rights, and therefore this claim should be dismissed. "Where, as here, a complainant names a defendant in the caption but the complaint contains no substantive allegation against the defendant, dismissal of the complaint is appropriate." *Garcia v. Watts*, No. 08 Civ. 7778 (JSR), 2009 WL 2777085, at *13 (S.D.N.Y. Sept. 1, 2009) (citing cases); *accord Dowdy v. Hercules*, No. 07 Civ. 2488 (ENV) (LB), 2010 WL 169624, at *6 (E.D.N.Y. Jan. 15, 2010) ("Obviously, where the complaint does not reference individuals, much less their personal involvement in a deprivation, claims against them should be dismissed for failure to satisfy pleading requirements.").

### 2.    The *Bivens* Claim Against Defendant Murray Should Be Dismissed

The SAC scarcely mentions Defendant Murray, much less alleges her personal involvement in any violation of Plaintiff's constitutional rights.  The SAC contains only a single paragraph that explicitly refers to Murray.  (*See* SAC ¶ 12.)  That paragraph—which refers to all of the Protection Defendants in an undifferentiated manner—alleges, in conclusory fashion, that the Protection Defendants "were fully aware that Plaintiff was a cooperating witness . . . , had already been threatened and attacked and that his life and safety were concern [sic]." (*Id.*)  The SAC further states that the Protection Defendants—again, in a group allegation without any particularity as to individual roles—were "responsible, in whole or in part, for the day-to-day operation and conditions of MDC and MCC, and for the health and safety of inmates confined within." (*Id.*)  However, "designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim." *Hendrickson v. U.S. Atty. Gen.*, No. 91 Civ. 8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994), *aff'd mem.*, 40 F.3d 1236 (2d Cir. 1994).  These group allegations should be disregarded. *See Atuahene*, 10 F. App'x at 34 (affirming dismissal

of constitutional and common law claims because the complaint "lump[ed] all the defendants together in each claim and provid[ed] no factual basis to distinguish their conduct").

The SAC's later paragraphs—which, once more, refer to the Protection Defendants collectively—are entirely conclusory and do not identify the role allegedly taken by Murray, or, for that matter, any of the other Protection Defendants.  For instance, the "failure to protect" allegations of the SAC make baldly conclusory statements of knowledge and involvement, including the following:

> 63. Defendants were aware that plaintiff's safety and well-being were at risk.
> 64. Defendants knew that they had a duty to protect plaintiff from harm.
> […]
> 74. Defendants despite being aware of the significant risk to plaintiff's health and despite giving assurances to plaintiff and his attorney, failed to protect him.
> 75. Defendants were given ample warning, were notified of instances when plaintiff's continually threatened [sic], but yet did nothing until plaintiff was attacked one more time resulting in severe injuries. Defendants had an opportunity to protect plaintiff and intervene to prevent harm to plaintiff.
> 76. Defendants were deliberately indifferent to plaintiff's safety and as a result of their action or lack thereof, plaintiff's rights under the Eighth and Fourteenth Amendment were violated and he suffered serious injuries.

(SAC ¶¶ 63-64, 74-76.)

These pleadings are plainly insufficient to plead personal involvement, because they "are no more than conclusions" or "[t]hreadbare recitals of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678-79.  Stripped of legal conclusions, recitals of the elements of a cause of action, and impermissible group allegations of knowledge and involvement, the SAC contains no factual support for a claim that Murray was personally involved in any alleged violation of Plaintiff's constitutional rights.  Accordingly, the Court should dismiss the *Bivens* claim against Murray.

### 3. The *Bivens* Claims Against Defendants Strada and Linaweaver Should Be Dismissed

The claims against former Wardens Frank Strada and Catherine Linaweaver—sued herein as "Warden MDC" and "Warden MCC," respectively—should be dismissed for similar

reasons.  The only allegation in the SAC that explicitly refers to Strada and Linaweaver appears in a single paragraph.  (*See* SAC ¶ 12 (referring to "Warden MCC" and "Warden MDC").)  The SAC contains only the most conclusory allegations of knowledge and personal involvement by Strada and Linaweaver.  Plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" clearly "do not suffice" to state a claim.  *Iqbal*, 556 U.S. at 678.

The allegation that Strada and Linaweaver had supervisory roles at MDC and MCC, where Plaintiff was incarcerated at times relevant to the complaint, does not support a *Bivens* claim.  "Because personal involvement by a federal official is a prerequisite to liability under *Bivens*, federal officials who are not personally involved in an alleged constitutional deprivation may not be held vicariously liable under *Bivens* for the acts of subordinates."  *Perez v. Hawk*, 302 F. Supp. 2d 9, 18-19 (E.D.N.Y. 2004) (dismissing claim against MDC warden for failure to allege personal involvement); *accord Morgan*, 2014 WL 3952917, at *2 ("Dismissal of a [*Bivens*] claim is warranted where a Plaintiff does no more than allege that defendant was in charge of the prison." (internal brackets and quotation marks omitted)); *Shannon v. U.S. Parole Comm'n*, No. 97 Civ. 6420 (JGK), 1998 WL 557584, at *2 (S.D.N.Y. Sept. 2, 1998) ("That the defendants may have had supervisory authority over those who violated the plaintiff's rights is not sufficient to make out a *Bivens* claim." (citing *Ellis v. Blum*, 643 F.2d 68, 85 (2d Cir. 1981)); *see also Turkmen*, 789 F.3d at 233 ("*Bivens* relief is available only against federal officials who are personally liable for the alleged constitutional tort." (citing *Iqbal*, 556 U.S. at 676-77)).

The SAC contains no non-conclusory allegations of personal knowledge or involvement by Strada and Linaweaver in any alleged constitutional violation.  "A complaint that essentially regurgitates the relevant 'personal involvement' standard, without offering any facts indicating

22

that, or how, an individual defendant in a supervisory role was personally involved . . . cannot

withstand dismissal." *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005).

Thus, the claims against Wardens Strada and Linaweaver should be dismissed.  *See Robinson v.*

*Lindsay*, No. 09 Civ. 2852 (RJD), 2009 WL 3007920, at *3 (E.D.N.Y. Sept. 21, 2009)

(dismissing claim against MDC warden where the complaint "failed to demonstrate that this

defendant was personally responsible for any of the alleged constitutional deprivations").

### 4.   The *Bivens* Claims Against Defendants Madison, Monge, Ward, and Hughes Should Be Dismissed

The SAC's generalized allegations against the Protection Defendants contain only

conclusory matter that cannot establish individual *Bivens* liability.  Defendants Madison, Monge,

Ward, and Hughes are referenced in one additional paragraph of the SAC, but it adds nothing in

terms of factual support that could give rise to a *Bivens* claim against them.  Paragraph 22 of the

SAC states that these four Defendants (without any further particularization) "were in charge of

MCC and were fully aware that Plaintiff had been threatened, was a [cooperating witness] and

that his safety was a concern."  (SAC ¶ 22.)  This paragraph contains nothing but conclusory

statements of involvement.  There is no allegation, for instance, that specifies how these

Defendants would have known of a risk of harm to Plaintiff, or in what way they were personally

involved in a failure to protect him.  The SAC thus "fails to give the defendants fair notice of

plaintiff's claims and fails to allege facts against each individual," and accordingly, these claims

should be dismissed.  *Southerland v. N.Y.C. Hous. Auth.*, No. 10 Civ. 5243 (SLT), 2010 WL

4916935, at *3 (E.D.N.Y. Nov. 23, 2010).

It is unclear what the SAC attempts to indicate by stating that Madison, Monge, Ward,

and Hughes were "in charge of MCC," but even assuming the SAC alleges that they were

supervisors, a "mere linkage in the prison chain of command is insufficient to implicate" a prison

official in an alleged constitutional violation.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (internal quotation marks omitted).  At most, these claims "fall into the category, discussed in *Iqbal*, 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'"  *Aguilar*, 811 F. Supp. 2d at 817.  Therefore, the claims against Madison, Monge, Ward, and Hughes should be dismissed.  *Id.*

### 5.     The *Bivens* Claim Against Defendant Thiessen Should Be Dismissed

The SAC contains one paragraph specifically concerning Defendant Thiessen, which states, in full: "Defendant Thiessen was made aware of the foregoing threats to Plaintiff and was informed to take steps to ensure plaintiff's safety."  (SAC ¶ 20.)  This is more of the same conclusory allegation of awareness of a generalized risk to Plaintiff's safety.  It does not provide any factual support for the claim against Thiessen beyond the SAC's vague and conclusory allegations of knowledge against the Protection Defendants in general.  *See Iqbal*, 556 U.S. at 679; *see also Atuahene*, 10 F. App'x at 34.  Divested of its conclusory statements, the SAC contains no plausible allegation that Thiessen knew of a particularized risk to Plaintiff's safety or was otherwise personally involved in any cognizable constitutional violation.  The SAC provides no factual allegation that would demonstrate, for instance, the source of Thiessen's purported knowledge or what actions she should have taken to protect Plaintiff.  Because the SAC's allegations do not contain factual support for Plaintiff's bare allegation of personal involvement by Thiessen, the claim against her should likewise be dismissed.

### 6.     The *Bivens* Claim Against Defendant Santiago Should Be Dismissed

The single paragraph of the SAC that specifically addresses Defendant Santiago's purported involvement in alleged constitutional deprivations states, in full: "Defendant Santiago who did the intake form for Plaintiff was also aware that Plaintiff had been subjected to assault and that his safety was in danger."  (SAC ¶ 21.)  The additional fact contained in this

paragraph—beyond the generalized and conclusory allegations that the SAC makes as to the Protection Defendants as a group—is that Defendant Santiago "did the intake form for Plaintiff." This allegation adds almost nothing to the conclusory nature of Plaintiff's claim of Santiago's knowledge of a risk of harm to Plaintiff and involvement in a purported constitutional violation.

Furthermore, the intake forms completed by Santiago—which are incorporated into the SAC by Plaintiff's reference thereto[8]—directly contradict Plaintiff's claim.  The BOP's central file for Plaintiff contains a document titled "Federal Bureau of Prisons Intake Screening Form," dated December 7, 2012.  (Ex. 1.[9])  This form, which was signed both by Defendant Santiago and Plaintiff, indicates Plaintiff's responses to a set of questions listed under the heading "Inmate Interview."  (*Id.*)  The intake form shows that Plaintiff responded "no" to the question, "Do you

---

[8] The intake forms themselves were not attached to the complaint, but the Court may consider them on a motion to dismiss because the SAC incorporates by reference the "intake form" completed by Defendant Santiago.  (SAC ¶ 22.)  Several months before the SAC was filed, Defendants produced a redacted version of Plaintiff's BOP central file as part of the parties' joint efforts to identify the "John Doe" defendants.  Accordingly, the intake forms were in Plaintiff's possession at the time of the drafting of the SAC as part of the discovery, and Plaintiff relied upon them in drafting the SAC's claim against Santiago.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider . . . documents incorporated by reference in the complaint.").  In the alternative, the Court may convert the motion to dismiss by Santiago into a motion for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(d).

[9] All exhibits referenced herein are attached to the Declaration of Hossam Georgy, submitted along with Defendants' motion to dismiss.

know of any reason that you should not be placed in general population?" (*Id.*) The form also indicates that Plaintiff responded "no" to the questions, "Have you assisted law enforcement agents in any way?," "Are you a [Central Inmate Monitoring] case?," "Have you testified against anyone in court?," and "Are you a member/associate of any gang?" (*Id.*) Below the signatures by Plaintiff and Santiago, the form contains a section marked "Staff Checklist," in which Santiago indicated that Plaintiff was "OK for general population."

Additionally, the central file contains a second intake form completed by Santiago on the same date. (Ex. 2.) This form, entitled "Screening for Risk of Victimization and Abusiveness," also reflects that Plaintiff answered "no" to the question "Do you have any reason to fear placement in general population?" (*Id.*) The form also reflects a "no" answer to the question, "Have you ever been placed in protective custody?" (*Id.*)

Thus, the only additional piece of factual information that the SAC contains concerning Defendant Santiago directly undermines Plaintiff's allegation that Santiago knew of threats against him. Both of the intake forms that Plaintiff completed with Santiago's assistance indicate that Plaintiff told Santiago that he knew of no reason that Plaintiff should not be placed in the general population at MCC. They also show that Plaintiff denied he had previously been in protective custody or had other reasons to fear assault in prison, such as cooperation with law enforcement or testimony against criminal defendants in court. Thus, Plaintiff's assertion that Santiago completed Plaintiff's intake form provides no basis for the allegation that Santiago was aware of any assault or threat against Plaintiff, and indeed, negates such an inference. Because the SAC fails to allege that Santiago was personally involved in any violation of Plaintiff's constitutional rights, this claim should be dismissed.

### 7.     The *Bivens* Claim Against Defendants Toossi and Tiscione Should Be Dismissed

Last, the claims against Defendant AUSAs Toossi and Tiscione should be dismissed for similar reasons to those set out above.  The SAC alleges that Toossi and Tiscione were informed by Plaintiff and his attorney "that there were threats leveled against Plaintiff" at MDC in November 2012.  (SAC ¶¶ 16-19.)  According to the SAC, Toossi and Tiscione provided assurances that the threats would be taken seriously and that "steps would be taken to prevent further threats or harm to Plaintiff."  (*Id.* ¶ 19.)  Plaintiff was then transferred from MDC to MCC.  (*Id.* ¶ 71.)  There is no plausible allegation that Plaintiff was threatened or assaulted at MCC prior to the incident alleged in the SAC, or that Toossi or Tiscione were advised of any such threat; nor does the SAC provide any other reason to believe that Toossi and Tiscione would have known of any serious risk to Plaintiff's safety at MCC.  If anything, the SAC supports the inference that Toossi and Tiscione responded properly to the complaints from Plaintiff and his attorney about his safety at MDC by requesting that he be transferred to MCC.  The SAC also does not assert that Toossi and Tiscione—or, for that matter, any of the individual defendants—knew that Plaintiff's attacker was associated with the alleged "members of organized crime" identified in the SAC.  Because no there is no plausible allegation that either Toossi or Tiscione was deliberately indifferent to a particular risk of harm to Plaintiff—and because the SAC, in fact, suggests just the opposite—the claims against them should be dismissed.  *See Morgan*, 2014 WL 3952917, at *3.

## IV.   THE COURT SHOULD GRANT THE MEDICAL DEFENDANTS' MOTION TO DISMISS

### A.     The Official-Capacity Claims Are Barred by Sovereign Immunity

Plaintiff purports to bring claims against the Medical Defendants in their official capacities.  (*See* SAC ¶ 13 (stating that the Medical Defendants are "sued in their acting

individual and official capacities").)  For the reasons set out above in section III.A, these claims

are barred as a matter of law and must be dismissed under Rule 12(b)(1).  *See Robinson*, 21 F.3d

at 510 (holding that the sovereign immunity of the United States extends to official-capacity

claims against federal employees).

**B.      The *Bivens* Claims Against the Medical Defendants Fail as a Matter of Law**

Plaintiff alleges that the Medical Defendants were deliberately indifferent to his medical

needs, in violation of the Eighth Amendment.  However, medical records integral to the SAC

demonstrate that Plaintiff was given medical attention and care by the Medical Defendants both

immediately after he was allegedly assaulted at MCC and on a number of subsequent occasions.

These records preclude Plaintiff's claim of deliberate indifference.

According to the SAC, Plaintiff was denied appropriate medical care by the Medical

Defendants in the aftermath of the alleged attack at MCC.  (*See* SAC ¶¶ 24-39.)  Even by the

SAC's account of events, however, Plaintiff alleges that he received the attention of medical staff

on numerous occasions after the June 25 incident: (1) in the direct aftermath of the alleged

assault (*id.* ¶ 25), (2) on July 9, 2013 (*id.* ¶ 27); (3) on July 15, 2013 (*id.* ¶ 28); (4) on July 24,

2013 (*id.* ¶ 29); on July 31, 2013 (*id.* ¶ 29); on August 1, 2013[10] (*id.* ¶ 31); and on August 6,

2013, when he received jaw surgery (*id.* ¶ 36).  Furthermore, Plaintiff's allegations that on these

occasions Defendants took "no steps" to help him, or denied him proper medical treatment, are

directly refuted by documents integral to the complaint.

Plaintiff's medical records from MCC (on which Plaintiff relied heavily in preparing his

pleadings) show that the SAC is demonstrably misleading—if not intentionally deceptive—in its

---

[10] The SAC, in an apparent typographical error, refers to "August 1, 2014."  (SAC ¶ 31.)

characterization of Plaintiff's medical care following the June 25 incident.[11]  To the extent that

the SAC is contradicted by the medical records integral to the complaint, its allegations should

_____

[11] Although Plaintiff's medical records are not attached to the SAC, it is proper for the Court to

consider them because the complaint "'relies heavily upon [their] terms and effect,' which

renders the document[s] 'integral' to the complaint."  *See Chambers v. Time Warner, Inc.*, 282

F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62

F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see also Aguilar*, 811 F. Supp. 2d at 818-19.  Several

months before the SAC was filed, Defendants produced Plaintiff's full set of medical records

from his time in the custody of BOP as part of the parties' joint efforts to identify the "John Doe"

defendants.  (*See* Dkt. Nos. 21, 22, 24.)  Plaintiff relied heavily on the medical records in

preparing the SAC.  For instance, the complaint states that "Defendants Ramos and Beaudouin

examined Plaintiff and noted that the head and right frontal area, face and pre-orbital [sic] and

right eyebrow area had redness and swelling." (SAC ¶ 25.)  A medical record from June 25,

completed by Ramos and cosigned by Beaudouin, noted "pain and swelling and redness on the

right frontal area and periorbital area," in addition to "right frontal area redness and swelling."

(Ex. 3.)  The same record noted contusions and abrasions, which are also mentioned in the SAC.

(*Id.*; SAC ¶ 25.)  As a second example, the SAC asserts that on July 9, 2013, Plaintiff saw

Defendant Evangelista, who "noted that Plaintiff's right jaw was tender."  (SAC ¶ 27.)  A

medical record from July 9, completed by Evangelista, notes: "Right mandible—tenderness on

movement.  No noted swelling, no infection."  (Ex. 5, at 1.)  Because the SAC's allegations are

taken directly from Plaintiff's medical records, they are integral to the SAC and it is proper for

the Court to consider the medical file in deciding Defendants' motion to dismiss under Rule

be disregarded.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)

(noting that courts need not presume the truth of a plaintiff's allegations when they are

"contradicted" by "documentary evidence" attached to and integral to the complaint); *Cortec*

*Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include

matters of which as pleaders they had notice and which were integral to their claim—and that

they apparently most wanted to avoid—may not serve as a means of forestalling the district

court's decision on [a 12(b)(6)] motion.").

The medical records indicate that Plaintiff received medical attention on June 25, 2013,

immediately following the alleged attack.  On that date, a record reflects that Plaintiff saw

defendant Ramos—a Mid-Level Practitioner at MCC—and stated that he "slipped on the wet

floor after taking a shower and hit [his] face on the bars."  (Ex. 3, at 1.)  Ramos noted "pain and

swelling and redness on the right frontal area and periorbital areas," and that Plaintiff "[f]eels [a]

little dizzy" but "[d]enies loss of consciousness."  (*Id.*)

The SAC alleges that Plaintiff requested an x-ray, but that the request was denied.  (SAC

¶ 26.)  According to the medical records integral to the complaint, this is simply incorrect, and

---

12(b)(6).  In the alternative, the Court may convert this branch of Defendants' motion to a

motion for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(d).

Plaintiff's allegation to the contrary should be rejected.[12]  Ramos's June 25 medical note, which was cosigned by Defendant Beaudouin, reflects that Ramos made a request for an x-ray the same day of the alleged attack—June 25, 2013.  (Ex. 2, at 2-3.)  The medical records further reflect that Plaintiff actually received a facial x-ray within three days—on June 28, 2013.  (Ex. 4.)  According to the records, an outside radiologist, Dr. Richard Reaven, reviewed that x-ray on June 28 and reported "[n]egative" findings.  (Id.)

The records further reflect that Plaintiff complained to Defendant Evangelista—a Mid-Level Practitioner at MCC—on July 9, 2013, that he "still ha[d] pains on [his] right jaw due to previous injury when he allegedly slipped on a wet floor."  (Ex. 5, at 1.)  However, Evangelista also noted—apparently referring to Dr. Reaven's June 28 radiology report—that the "X[-]ray of facial bones result is [n]egative."  (Id.)  The same day, Plaintiff was referred by Evangelista to Defendant Jackson, a dentist on staff at MCC.  (Ex. 6.)  Dr. Jackson's note states that Plaintiff

---

[12] Even if this allegation were entitled to the presumption of truth, it is unlikely that it could support a deliberate indifference claim.  *See Victor v. Milicevic*, 361 F. App'x 212, 214 (2d Cir. 2010) (summary order) (stating that the Supreme Court noted in *Estelle* that "medical decisions such as whether or not to order X-rays or other 'diagnostic techniques' do not rise to the level of cruel and unusual punishment but are, at most, indicative of medical malpractice" (citing *Estelle*, 429 U.S. at 107)); *Palacio v. Ocasio*, No. 02 Civ. 6726 (PAC) (JCF), 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) (holding that a defendant doctor's "decision not to x-ray [the plaintiff's] jaw and his failure to diagnose the fracture" failed to support a deliberate indifference claim, absent "a culpable recklessness in the manner in which [the defendant] diagnosed [the plaintiff's] injury"), *aff'd sub nom. Palacio v. Pagan*, 345 F. App'x 668 (2d Cir. 2009) (summary order).

could not be escorted to the dental clinic that day because of an "emergency lock down," and would be seen at the next SHU clinic.  (*Id.*)

On July 15, 2013, a medical record indicates that Plaintiff complained to Defendant Evangelista that his "right jaw still hurts since [it was] injured."  (Ex. 7, at 1.)  The same report reflects that Evangelista ordered another x-ray of Plaintiff's mandible the same day.  (*Id.*)  Dr. Jackson stated in a note that Plaintiff "was placed on call out multiple time[s] while in & out of SHU & did not present to clinic" in the second half of July.  (Ex. 13.)  Notes by Dr. Jackson dated July 22, 24, and 31 reflect Plaintiff's non-attendance to his "call out" to the dental clinic on these days.  (*See* Ex. 8 ("SHU [inmate] was not escorted to the dental clinic. [W]ill reschedule"); Ex. 9 ([Patient] did not present to his call out.  [W]ill reschedule"); Ex. 11 ("[Patient] on call out did not present [to] the dental clinic 2X no show. [Patient] rescheduled.").)[13]

Plaintiff's medical file indicates that he received a second x-ray of his jaw on July 25, 2013.  (Ex. 10.)  A different outside radiologist, Dr. Brian Brune, concluded that the July 25 x-ray was "[a]bnormal," noting a "[n]ondisplaced fracture through the mandible to the left of midline along the ascending ramus just below the mandibular notch."  (*Id.*)  A handwritten notation on the x-ray report, apparently by Defendant Bussanich, notes that Plaintiff is "[t]o be evaluated by Dr. Jackson DDS."  (*Id.*)

On July 31, 2013, Dr. Beaudouin noted that Plaintiff was "on the callout" to visit the health services unit, but was "frozen" and could not be brought to health services.  (Ex. 12.)  On the following day, August 1, Plaintiff reportedly saw Dr. Jackson in the medical clinic.  (Ex. 13.)

---

[13] On July 24, 2013, medical records reflect that Plaintiff consulted with Defendant Tin Chin, a contract psychiatrist.  (Ex. 27.)  There is no indication that Plaintiff made any complaint to Dr. Chin concerning his jaw or other physical ailments.  (*See id.*)

Dr. Jackson reported that a "limited clinic examination revealed no oral or facial swelling, occl[usion] & maximum opening [within normal limits]." (*Id.*) Plaintiff reportedly stated that he had a pain level of 3 to 5 out of 10 and stated that he was only eating soft food. (*Id.*) The note states that Dr. Jackson told Plaintiff to avoid applying pressure to his jaw and to "remain on soft diet." (*Id.*) Dr. Jackson also reviewed Plaintiff's more recent x-ray, noted that it "indicate[s] non[-]displaced fracture of r[igh]t mandible," and immediately referred Plaintiff for a consultation with an oral maxillofacial surgeon. (*Id.*) Dr. Jackson's note also reflects that she prescribed Plaintiff a course of Clindamycin, an antibiotic, which was recommended by the surgeon. (*Id.*)

On the same day, Plaintiff was examined by Dr. Beaudouin. (Ex. 14.) It was apparently not until this point that Plaintiff finally told MCC medical providers a different story about the source of his injuries—this time, he reportedly told Dr. Beaudouin that he was "jumped by 2 inmates in his unit" on June 25, 2013. (*Id.* at 2.) Plaintiff also reportedly told Dr. Beaudouin that the swelling from the injury was "resolved," but that he had "pain in his [right] jaw when he opens up his mouth and when chewing." (*Id.*) Dr. Beaudouin noted that Plaintiff was "evaluated by [the] dentist"—Dr. Jackson—"earlier today and the plan is for him to be referred to an oral maxillofacial surgeon for further evaluation." (*Id.*) In Plaintiff's plan, the medical report notes (1) that Plaintiff is "36 lbs. overweight" and urged weight loss; (2) that Plaintiff "is to have eval[uation] with oral maxillo[-]facial surgeon soon"; and (3) that Plaintiff "was started on antibiotic by the dentist." (*Id.* at 5.)

On August 2, 2013, the Utilization Review Committee at MCC approved the recommendation that Plaintiff receive oral surgery. (Ex. 15.) By August 6, Plaintiff's medical records reflect that an outside oral surgeon, Dr. Mordechai Hoschander, had performed surgery

and wired Plaintiff's jaw to allow it to heal.  (Exs. 16, 17.)  Plaintiff's antibiotic prescription was

changed to Amoxicillin.  (Ex. 17, at 2.)  According to Dr. Hoschander's notes and a note by Dr.

Jackson, the change in antibiotics was at Dr. Hoschander's recommendation.  (Ex. 16, at 2; Ex.

19, at 1.)

On August 7, 2013, Dr. Jackson noted that Plaintiff was "called down to the [dental]

clinic to discuss his diet while his jaw is wired."  (Ex. 18.)  After Plaintiff complained about the

liquid diet provided by the kitchen at MCC, the medical staff ordered that, pursuant to his

request, Plaintiff be provided additional cans of Ensure liquid nutrition supplement several times

daily.  (Exs. 20, 21.)  Dr. Jackson also required Plaintiff to report to the "pill line" to ensure that

he was taking his antibiotics.  (Ex. 21, at 1.)  On August 20, the outside oral surgeon removed

Plaintiff's jaw wires.  (Exs. 24-25.)  Dr. Hoschander reported that Plaintiff had "no apparent

discomfort or change in occlusion" after the wires were removed.  (Ex. 24.)

### 1. Plaintiff's Claims Relating to the Diagnosis and Treatment of His Jaw Condition Should Be Dismissed

Plaintiff fails to plausibly allege that the Medical Defendants were deliberately

indifferent to his medical needs.  The SAC simply does not meet the vital subjective component

of the deliberate indifference test[14]—that is, the SAC fails to plausibly allege that any of the

---

[14] For purposes of this motion, the Medical Defendants assume *arguendo* that the SAC pleads

that Plaintiff suffered sufficiently serious injuries for the objective prong of the test.  *See*

*Palacio*, 2006 WL 2372250, at *10 (assuming without deciding that broken jaw constituted a

serious medical condition).  *But see Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995)

(noting that some courts have found that "a mild concussion and broken jaw" do not constitute

serious medical conditions (citing *Jones v. Lewis*, 874 F.2d 1125 (6th Cir. 1989)).

Medical Defendants "knew of and disregarded the plaintiff's serious medical needs." *Chance*, 143 F.3d at 703; *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness."). To make this allegation, Plaintiff "must . . . plausibly allege facts demonstrating that 'the charged officials acted or failed to act while *actually aware* of substantial risk that serious inmate harm would result." *DeMeo v. Koenigsmann*, No. 11 Civ. 7099 (HBP), 2015 WL 1283660, at *12 (S.D.N.Y. Mar. 20, 2015) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)) (emphasis in *DeMeo*) (brackets omitted). The SAC fails to meet the "very high standard" for deliberate indifference, *see Madera v. Ezekwe*, No. 10 Civ. 4459 (RJD) (LB), 2013 WL 6231799, at *11 (E.D.N.Y. Dec. 2, 2013), as to any of the Medical Defendants, particularly in light of Plaintiff's medical records, *see, e.g.*, *Olmedo v. Corizon P.C.*, No. 14 Civ. 3853 (AT) (HBP), 2015 WL 4002306, at *3 (S.D.N.Y. June 22, 2015) (dismissing deliberate indifference claim where the plaintiff did "not contend that the [defendants] completely disregarded his medical needs," and instead, it was "clear that Plaintiff has been afforded significant medical attention").

The gravamen of Plaintiff's *Bivens* claims regarding the medical treatment of his jaw condition at MCC appears to be that the Medical Defendants failed to diagnose that his jaw was fractured for a period of six weeks, and as a result gave him inadequate treatment during this period. Even assuming this allegation were true as to any of the Medical Defendants, it is clear that "mere negligence in misdiagnosing and treating a condition does not violate the Eighth Amendment." *El-Hanafi v. United States*, No. 13 Civ. 2072 (GHW), 2015 WL 72804, at *12 (S.D.N.Y. Jan. 6, 2015); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (a medical professional's "negligen[ce] in diagnosing or treating a medical condition does not state a valid

claim of medical mistreatment under the Eighth Amendment"); *Harrison v. Barkley*, 219 F.3d

132, 139 (2d Cir. 2000) (no Eighth Amendment claim arises from "a delay in treatment based on

a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based

on an erroneous view that the condition is benign or trivial or hopeless, or that the treatment is

unreliable, or that the cure is as risky or painful or bad as the malady" (citing *Estelle*, 429 U.S. at

105-06)).  Thus, even taking Plaintiff's pleadings at face value, he has failed to plead that the

Medical Defendants acted in "reckless disregard for his safety and health."  *El-Hanafi*, 2015 WL

72804, at *16.

    Furthermore, Plaintiff appears deliberately to ignore certain salient details from the

medical records that are integral to the SAC.  In particular, Plaintiff makes no mention of the x-

ray of Plaintiff's face ordered on June 25, conducted on June 28, and interpreted by an outside

radiologist.  (*See* Ex. 4.)  That x-ray interpretation, by outside radiologist Dr. Richard Reaven,

reported "negative" findings.  (*Id.* at 1.)  A review of the medical records, set out above,

indicates that the Medical Defendants—none of whom are radiologists—reasonably relied upon

the June 28 x-ray report in diagnosing and treating Plaintiff's jaw.  The SAC contains no

explanation of how the Medical Defendants *should have known* of his fractured jaw, despite the

negative x-ray reading.  Moreover, the Medical Defendants provided adequate care on each

occasion they examined Plaintiff.  When Plaintiff continued to complain of jaw pain, a second x-

ray was ordered.  (Ex. 7.)  After medical staff reviewed the second outside radiologist's reading

of that x-ray, which showed a jaw fracture, Plaintiff was referred to a dentist and then for jaw

surgery.  (Exs. 10, 13.)  These facts, which show a continuous series of examinations and

treatment by the Medical Defendants, simply cannot support a claim of deliberate indifference

against any of the Medical Defendants.  *See Buffaloe v. Fein*, No. 12 Civ. 9469 (AJP), 2013 WL

5815371, at *8 (S.D.N.Y. Oct. 24, 2013) (finding no deliberate indifference where the plaintiff's medical records "demonstrate[d] . . . that doctors were monitoring [his] condition"), *report & rec. adopted*, 2014 WL 1224446 (S.D.N.Y. Mar. 20, 2014).

Furthermore, an individual review of Plaintiff's *Bivens* claims shows that each of them fails, because Plaintiff has failed to plead that any of the Medical Defendants had the necessary subjective state of mind required to state a deliberate indifference claim. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("Defendants were sued in their individual capacities; the liability of each therefore depends on a showing that he or she acted with deliberate indifference.").

### (a)  Ramos

The SAC makes two references to Defendant Ramos.  First, the SAC claims that all of the Medical Defendants (along with Defendant Chin) "are medical personnel employed by the DOJ or FBOP sued in their acting individual and official capacities, and responsible for the day-to-day oversight of medical examination, testing, treatment and general health of inmates confined at MDC and MCC."  (SAC ¶ 13.[15])

The only other reference to Ramos states that Ramos and Dr. Beaudouin examined Plaintiff on June 25, 2013—the date of the alleged assault—and noted facial swelling and contusions.  (*Id.* ¶ 25.)  The SAC asserts that Ramos and Dr. Beaudouin "simply gave plaintiff a prescription for ibuprofen," and states that when Plaintiff asked for an x-ray, "[h]is requests were denied." (*Id.*)

---

[15] In an apparent error, the SAC contains two paragraphs numbered 13.  All references herein are to the first of those paragraphs.

As noted above, however, the medical records directly contradict the SAC's version of events. Ramos's own medical note indicates that he examined Plaintiff, recorded Plaintiff's initial (and apparently false) account of how the injury occurred, took notes of his symptoms, prescribed him ibuprofen tablets and ice compresses, and— importantly—ordered an x-ray the same day. (Ex. 3, at 1-2.) Thus, the medical file indicates that Ramos provided adequate care for Plaintiff's contusions and abrasions and scheduled an x-ray to determine whether Plaintiff would require further treatment. Plaintiff's pleadings do not suffice to allege that Ramos was aware of a risk of serious harm to Plaintiff and disregarded it. *See Chance*, 143 F.3d at 703; *see also Farmer*, 511 U.S. at 837. Plaintiff's claim that Ramos was deliberately indifferent to his medical needs should accordingly be dismissed.

### (b)     Beaudouin

The SAC makes allegations concerning several interactions between Plaintiff and Defendant Beaudouin. As noted above, the SAC states that Plaintiff saw Ramos and Dr. Beaudouin on June 25, the date of the alleged attack. (SAC ¶ 25.) For the same reasons set out above, Plaintiff's allegations regarding the June 25 consultation cannot support a deliberate indifference claim against Dr. Beaudouin, because Plaintiff's medical needs were in fact addressed on that date and further diagnostic tests were ordered.

Next, the SAC asserts that Plaintiff saw Drs. Chin and Beaudouin on July 24, 2013. (*Id.* ¶ 29.) As noted above, *see supra* note 13, the medical records reflect that Plaintiff consulted with Dr. Chin, a psychiatrist, on July 24, but made no mention of his jaw condition. (Ex. 27.) While Dr. Beaudouin co-signed Dr. Chin's report several hours later, there is no indication that Dr. Beaudouin saw Plaintiff on this date. (*See id.* at 3.)

The SAC claims that on July 31, 2013, Plaintiff "was denied medical treatment by defendant Beaudouin," despite Plaintiff's "request for medical attention and continuing injury."

(SAC ¶ 30.)  However, Dr. Beaudouin's note of that date refutes Plaintiff's claim that Dr. Beaudouin "denied" Plaintiff medical treatment.  Rather, the note reflects that Plaintiff was "on the callout" to visit the health services unit, but Dr. Beaudouin was informed by an officer that Plaintiff could not be brought to health services.  (Ex. 12.)  Even assuming that there was any delay in Plaintiff's treatment, courts have "refused to find deliberate indifference where delays in treatment were caused by circumstances that were outside the control of the charged officials." *Madera*, 2013 WL 6231799, at *12 (citing cases).

Last, the SAC alleges that Plaintiff saw Drs. Jackson and Beaudouin on August 1 and complained of jaw pain.  (SAC ¶ 31.)  The SAC does not reflect that Dr. Beaudouin did anything in particular at this time to deny him adequate care.  And a review of Dr. Beaudouin's medical record from that date shows that he conducted a full examination of Plaintiff, including his mental health, and any orthopedic and gastrointestinal issues.  (Ex. 14.)  Plaintiff reportedly told Dr. Beaudouin that he had been "jumped by 2 inmates" and punched from behind in the jaw, that his "jaw was swollen" but the "swelling is now resolved," and that he still has pain in his jaw "when he opens up his mouth and when chewing."  (*Id.* at 2.)  Dr. Beaudouin noted that Plaintiff had been evaluated by Dr. Jackson that day and that "the plan is for him to be referred to an oral maxillofacial surgeon for further evaluation."  (*Id.* at 5.)  The record thus shows that Dr. Beaudouin was not deliberately indifferent to Plaintiff's medical needs, but rather evaluated him and referred him to a surgeon.

All told, the SAC's allegations relating to Dr. Beaudouin amount to very little.  Plaintiff's pleadings simply cannot be construed to allege that Dr. Beaudouin acted with a state of mind equivalent to "criminal recklessness."  *See Hathaway*, 99 F.3d at 553.  Particularly in light of the medical records integral to the SAC, it is clear that Dr. Beaudouin was not indifferent, but

instead consistently provided appropriate medical care to Plaintiff.  Accordingly, the claim against Dr. Beaudouin should be dismissed.

(c)      **Evangelista**

The SAC refers to two occasions on which Plaintiff was treated by Defendant Evangelista.  First, on July 9, Plaintiff alleges, he was brought to the infirmary "after his previous repeated requests for medical attentions were ignored" and saw Evangelista.  (SAC ¶ 27.) Evangelista "noted that Plaintiff's right jaw was tender."  (*Id.*)  Plaintiff alleges that, although he complained that "his jaw was possibly broken and he needed more than an ibuprofen to treat it," his "requests were ignored."  (*Id.*)

The medical records confirm that Plaintiff did in fact see Evangelista on July 9, 2013, but tell a different story.  Plaintiff is reported to have stated that he "still ha[d] pains on [his] right jaw due to previous injury when he allegedly slipped on a wet floor."  (Ex. 5, at 1.) Evangelista's note states, "X[-]ray of facial bones result is [n]egative."  (*Id.*)  The record indicates that Evangelista performed an examination of Plaintiff's face and noted "tenderness on movement" of Plaintiff's right mandible, but also noted that he observed no swelling or infection.  (*Id.*)  According to Evangelista's report, Plaintiff requested a refill of his medication, which Evangelista provided.  (*Id.*)  Furthermore, Evangelista apparently referred Plaintiff to Dr. Jackson, the dentist: Dr. Jackson's note from the same day indicates that she received a report from a PA, or physician assistant, that Plaintiff "state[s] he has pain in jaw, associated with injury sustained on 6/25/2013."  (Ex. 6.)  As noted above, due to an "emergency lock down," Dr. Jackson noted that Plaintiff could not be escorted to the dental clinic that day, but her report states that he would "be scheduled for the next SHU dental clinic."  (*Id.*)

Second, Plaintiff alleges that he saw Evangelista again on July 15 "after his previous repeated requests for medical attentions were again ignored."  (SAC ¶ 28.)  The SAC asserts that

40

Plaintiff complained once again "about his right jaw being hurting [sic]," "that he could barely open his mouth and not intake any solid foods," and that he was "losing weight because of his inability to consume food." (*Id.*)  Despite this, Plaintiff contends, "Defendant took no steps to quell Plaintiff's misery." (*Id.*)  But once again, Plaintiff's contentions cannot be reconciled with the medical records integral to the SAC.  Evangelista's note from July 15 recorded Plaintiff's complaint that his "right jaw still hurts since injured," and that "pain medication does not work." (Ex. 7.)  Evangelista reported that he examined Plaintiff's face and noted tenderness on movement of Plaintiff's right jaw and on opening his mouth. (*Id.*)  However, in direct contradiction to the SAC's account of events, Evangelista did take action in response to Plaintiff's continued report of pain: he ordered a second x-ray. (*Id.*)  This second x-ray, according to the second outside radiologist's report, revealed that Plaintiff had suffered a fracture to his jaw. (Ex. 10.)

The SAC's allegations regarding the two interactions between Plaintiff and Evangelista cannot give rise to a claim of deliberate indifference.  The medical records integral to the complaint clearly preclude Plaintiff from pleading that Evangelista was deliberately indifferent to his serious medical needs.  Evangelista simply did not "know[] of and disregard[] an excessive risk to [Plaintiff's] health." *Hathaway*, 37 F.3d at 66 (quoting *Farmer*, 511 U.S. at 837).  Instead, Evangelista provided adequate care each of the times that Evangelista treated Plaintiff during the relevant period.  On July 9, the records reflect that Evangelista examined Plaintiff's jaw, gave Plaintiff a refill of his pain medication at Plaintiff's request, reviewed the first outside radiologist's "negative" interpretation of Plaintiff's first x-ray, and brought Plaintiff's condition to the attention of MCC's dental clinic. (Exs. 5, 6.)  And on July 15, the medical records indicate that Evangelista examined Plaintiff's jaw and ordered a second x-ray in an attempt to locate the

source of Plaintiff's complaints.[16]  (Ex. 7.)  It simply cannot be said that Evangelista was aware

of a serious risk to Plaintiff's health and disregarded it.  *See Farmer*, 511 U.S. at 837.

Accordingly, the *Bivens* claim against Defendant Evangelista should be dismissed.

> **(d)    Jackson**

The SAC refers to Defendant Jackson only twice.  First, it identifies Dr. Jackson as one

of the "medical personnel employed by" BOP—the same allegation made against all of the

Medical Defendants (SAC ¶ 13).  Second, the SAC recounts that Plaintiff saw Drs. Jackson and

Beaudouin on August 1 and complained of jaw pain.  (*Id.* ¶ 31.)  Plaintiff alleges that "Defendant

Jackson told plaintiff that he should chew from his other side of the face because there does not

appear to be anything wrong with his jaw and it was just swollen."  (*Id.*)  Even assuming that Dr.

Jackson made this statement, there is nothing to suggest that Dr. Jackson *knew* that Plaintiff's

condition was in fact more serious, but nonetheless disregarded a serious risk to his health.  The

SAC's pleadings fail to make out a claim of deliberate indifference by Dr. Jackson.  *See*

*Hathaway*, 99 F.3d at 553.

Furthermore, the claim against Dr. Jackson is directly undermined by the medical records

integral to the SAC.  While Dr. Jackson's medical note from August 1 reflects her

recommendation that Plaintiff remain on a soft diet and avoid pressure to his jaw, it contradicts

Plaintiff's claim that she told him that there did not appear to be anything wrong with his jaw.

(Ex. 13.)  The August 1 record indicates that Dr. Jackson reviewed Plaintiff's second x-ray report

---

[16] As noted above, Evangelista also saw Plaintiff with regard to his complaint regarding his

liquid diet on August 11, 2013.  (Ex. 20.)  Evangelista—far from ignoring Plaintiff's

complaints—responded by referring these complaints to Dr. Jackson, who ordered additional

Ensure supplements to be added to Plaintiff's diet.  (Ex. 21.)

that day, saw that it reflected a jaw fracture, and scheduled Plaintiff an appointment with the oral surgeon the same day.  (*Id.*)  This record, in conjunction with the other medical records integral to the complaint—which show that Dr. Jackson was closely involved in treating Plaintiff *after* his second x-ray, once the jaw fracture had been diagnosed—further undercuts Plaintiff's claim. Accordingly, the *Bivens* claim against Dr. Jackson should be dismissed.

**(e)   Bussanich**

Plaintiff makes no allegation concerning Defendant Bussanich's personal involvement in any alleged deprivation of Plaintiff's constitutional rights.  In fact, the only mention of Bussanich in the entirety of the SAC is in the paragraph that states that Bussanich and the other Medical Defendants "are medical personnel employed by the DOJ or FBOP . . . responsible for the day-to-day oversight of medical examination, testing, treatment and general health of inmates confined at MDC and MCC."  (SAC ¶ 13.)  Nor does the SAC state a claim against Bussanich for any purported supervisory role; as discussed above, the doctrine of *respondeat superior* does not apply in *Bivens* cases.  *See Iqbal*, 556 U.S. at 676-77; *Turkmen*, 789 F.3d at 250.  Plaintiff fails even to allege that Bussanich was aware of the care provided to Plaintiff by other personnel. *Cf. Yearney v. Sidorowicz*, No. 13 Civ. 3604 (CM), 2014 WL 2616801, at *8-9 (S.D.N.Y. June 10, 2014) (dismissing deliberate indifference claim against chief medical officer despite the plaintiff's allegation that he wrote several letters to the officer requesting intervention in his medical care).  Because the SAC fails to make any allegation of any misconduct by Bussanich, or even any allegation as to Bussanich's involvement in Plaintiff's medical care, the claim against Bussanich necessarily fails.

2.      **Plaintiff's Claims Relating to the Provision of Medication and a Liquid Diet Are Baseless and Should Be Dismissed**

Plaintiff also alleges that the Medical Defendants "refused to provide Plaintiff with any medication or liquid diet as prescribed by the treating physician," and that as a result, he was denied "proper nutrition" and lost weight.  (SAC ¶¶ 37-38.)  Initially, these paragraphs of the SAC do not specify which of the Medical Defendants are alleged to have been personally involved in this alleged violation of Plaintiff's constitutional rights, a separate ground for dismissal of this claim.  *See Atuahene*, 10 F. App'x at 34 (affirming dismissal of constitutional and common law claims because the complaint "lump[ed] all the defendants together in each claim and provid[ed] no factual basis to distinguish their conduct").

In addition, Plaintiff's allegations, once again, are belied by the records integral to the SAC.  Plaintiff's medical records indicate, contrary to the SAC's assertions, that Plaintiff was indeed provided medication and a liquid diet.  However, Plaintiff was unhappy with the *type* of liquid diet that was provided to him, refused to eat it, and refused to take the medication provided to him.  This stands in direct opposition to the SAC's version of the facts, which should be set aside.  Because there is no indication of indifference by any of the Medical Defendants concerning Plaintiff's liquid diet, any claim premised on these allegations should be dismissed.

According to the medical reports, Plaintiff was prescribed a liquid diet and additional antibiotics immediately after his jaw was wired by the oral surgeon.  (Ex. 18.)  As noted, on August 7, 2013, Dr. Jackson noted that Plaintiff was "called down to the [dental] clinic to discuss his diet while his jaw is wired."  (*Id.*)  Plaintiff reportedly protested that the liquid diet provided by the MCC kitchen was "garbage" and asked to be permitted to prepare his own liquid meals.  (*Id.*)  Dr. Jackson noted that she warned Plaintiff that preparing his own meals would put him "at risk for aspirating or asphyxiation," indicated that she would "contact food service to begin

liquid diet," with an "additional liquid snack provided at lunch and dinner," and would also "write [a prescription] for 1 [E]nsure supplement"—a liquid nutritional supplement— "daily at breakfast." (Ex. 19, at 1.)

According to a note in the medical file, Plaintiff stated to Defendant Evangelista on August 11, 2013, that he was "not eating except Ensure for the last 2 days." (Ex. 20, at 1.) He also reportedly requested oatmeal and stated that he was "not taking [his] antibiotics because [he was] not eating well." (*Id.*) Evangelista noted that Plaintiff "demanded his Tylenol #3 and Ensure." The next day, August 12, 2013, Dr. Jackson noted having been told by a physician assistant (presumably Evangelista) that Plaintiff was "not accepting his food service liquid diet" and "is not taking his antibiotic." (Ex. 21, at 1.) As a result, Dr. Jackson noted that "if [Plaintiff] cannot tolerate liquid diet," she would "increase [Plaintiff's] [E]nsure" to two servings, provided three times a day; "continue liquid diet"; and place Plaintiff "on pill line to confirm compliance with antibiotic." (*Id.*) No complaints by Plaintiff concerning the liquid diet are recorded in the medical file subsequent to this change. Furthermore, Plaintiff's medication administration record reflects that, starting in the afternoon of August 12 (when Plaintiff was placed on the pill line) and continuing through August 21, 2013, Plaintiff was marked as having received his antibiotic twice daily. (Ex. 22.) On August 19, 2013, Dr. Beaudouin noted that he would renew the order for Ensure supplements until Plaintiff "is reassessed." (Ex. 23.) And on August 21, 2013, Dr. Beaudouin noted that Plaintiff's "mandibular wires were removed by the oral surgeon" the previous day, so "he is able to eat regular food" and "the Ensure will be [discontinued]." (Ex. 26.)

Thus, the integral medical records refute Plaintiff's claim that the Medical Defendants refused to provide him with proper nutrition. Jackson, Evangelista, and Beaudouin—the only

45

Medical Defendants involved with Plaintiff's liquid diet, according to the medical file—provided adequate care at every step.  First, the records make clear that Plaintiff began receiving his medication and a liquid diet immediately after his oral surgery.  While the *type* of liquid diet was perhaps one that Plaintiff did not prefer, an inmate's "[p]reference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu."  *Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001); *accord Harris v. Fischer*, No. 11 Civ. 6260 (CM) (JLC), 2014 WL 3859242, at *28 (S.D.N.Y. Aug. 1, 2014) (holding that "prison officials are under no obligation to honor alternative meal preferences of a non-religious nature").  Next, any failure to take medication was by Plaintiff's own choice, not because he was denied medication by the Medical Defendants.  Indeed, Dr. Jackson placed Plaintiff on the pill line to ensure that he would take the medication—the opposite of what the SAC asserts occurred—and records reflect that Plaintiff was given his antibiotic twice daily.  (*See* Exs. 21, 22.)   Last, it is clear that several days into Plaintiff's liquid diet, after Plaintiff complained yet again, prison officials were responsive to his requests and he was given additional Ensure supplements— which he apparently preferred to the MCC-provided liquid diet—at each meal.  Accordingly, any claim on the basis of a purported refusal to provide Plaintiff with a liquid diet or medication should be dismissed.

## V.   THE *BIVENS* CLAIMS ARE ALSO BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY

Plaintiff's *Bivens* claims against the Protection Defendants and the Medical Defendants fail for the additional reason that these defendants are entitled to qualified immunity from suit on such claims.  The doctrine of qualified immunity "entitles public officials to freedom from suit for acts undertaken in their official capacity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts

did not violate those rights." *Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000)

(internal quotation marks omitted).  Accordingly, the qualified immunity standard "gives ample

room for mistaken judgments by protecting all but the plainly incompetent or those who

knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation

marks omitted).  Furthermore, qualified immunity is an "*immunity from suit* rather than a mere

defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The Supreme Court has

"repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible

stage in litigation."  *Hunter*, 502 U.S. at 227 (citing cases).

　　　To determine whether an official is immune from suit, "the appropriate question is the

objective inquiry whether a reasonable officer could have believed that [her actions were] lawful,

in light of clearly established law and the information the officer[] possessed."  *Wilson v. Layne*,

526 U.S. 603, 615 (1999).  A court analyzes whether "the facts, viewed in the light most

favorable to the plaintiff, show that the official's conduct violated a constitutional right."

*Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (internal quotation marks and brackets

omitted).  "If the plaintiff has satisfied that part, the court must decide whether the right at issue

was 'clearly established' at the time of the defendant's alleged misconduct."  *Id.* (citing *Pearson*

*v. Callahan*, 555 U.S. 223, 232 (2009) (brackets omitted)); *Gilles v. Repicky*, 511 F.3d 239, 243

(2d Cir. 2007).  "If the conduct did not violate a clearly established constitutional right, or if it

was objectively reasonable for the official to believe that his conduct did not violate such a right,

then the official is protected by qualified immunity."  *Id.* (quoting *Gilles*, 511 F.3d at 244)

(internal quotation marks omitted).

　　　For the reasons discussed above, Plaintiff has failed to allege that either the Protection

Defendants or the Medical Defendants violated any clearly established constitutional right.  *See*

*supra* sections III and IV.  Therefore, they are entitled to qualified immunity with regard to Plaintiff's *Bivens* claims.

## VI.   PLAINTIFF'S "CONDITIONS OF CONFINEMENT" CLAIM SHOULD BE DISMISSED

The final claim in Plaintiff's complaint is labeled "Conditions of Confinement."  (SAC ¶¶ 93-100.)  Its legal basis not entirely clear, but it appears to be a constitutional claim, as it asserts that Plaintiff "was subject to violation of his constitutional rights."  (*Id.* ¶ 100.)  To the extent that Plaintiff attempts to bring this claim against the United States or its agencies under the FTCA, it is barred by sovereign immunity.  *See Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts.").

If Plaintiff is attempting to bring the "conditions of confinement" claim under *Bivens*, it fails for other reasons.  First, the SAC names no particular individual defendant who is asserted to have committed any asserted constitutional violation, and thus fails to allege personal involvement by any of the defendants.  *See* discussion *supra* section III.C.  Second, the gravamen of this claim appears to be that Plaintiff was placed "in a punitive unit" after the alleged attack on June 25, 2013.  (*See* SAC ¶¶ 95-99.)  To the extent Plaintiff seeks to assert a due process claim based on an alleged placement in segregation, "typical punitive segregation conditions imposed for 101 days or fewer generally do not constitute atypical conditions of confinement" that give rise to a constitutionally protected liberty interest.  *Abdur-Raheem v. Caffery*, No. 13 Civ. 6315 (JPO), 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (internal quotation marks omitted); *see Palmer v. Richards*, 364 F.3d at 64-65 (2d Cir. 2004).  Plaintiff does not allege that either the length of his segregation or his conditions of confinement were "atypical."  Third, to the extent Plaintiff attempts to assert a *Bivens* claim that his conditions of

48

confinement violated the Eighth Amendment's proscription of cruel and unusual punishment, Plaintiff fails to plead that any individual defendant had the required subjective state of mind to render them deliberately indifferent to any serious risk to his safety.  *See Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003) ("[I]n prison-conditions cases the state of mind requirement is one of 'deliberate indifference' to inmate health or safety." (quoting *Farmer*, 511 U.S. at 834) (internal brackets omitted)).  For these reasons, Plaintiff's "Conditions of Confinement" claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated:   January 12, 2016
         New York, New York

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the Government*

By:      /s/ Samuel Dolinger
         SAMUEL DOLINGER
         Assistant United States Attorney
         86 Chambers Street, 3rd Floor
         New York, New York 10007
         Tel.:  (212) 637-2677
         Fax:  (212) 637-2702
         Email: samuel.dolinger@usdoj.gov